

FILED
2/21/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AUSA Saqib M. Hussain, (312) 353-1414

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

In the Matter of the Search of:

Case No. 23 CR 89

The gold Toyota Camry bearing Illinois license plate DL 4333 A located at 2111 W. Roosevelt Road in Chicago, Illinois, further described in Attachment A

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Robert P. Aronson, a Special Agent of the Federal Bureau of Investigation, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

### See Attachment A

located in the Northern District of Illinois, there is now concealed:

### See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is evidence, instrumentalities, and fruits.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 2113 | bank robbery |

The application is based on these facts:

### See Attached Affidavit,

Continued on the attached sheet.

_____
*Applicant's Signature*

ROBERT P. ARONSON, Special Agent
Federal Bureau of Investigation (FBI)
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone.

Date: February 21, 2023

_____
*Judge's signature*

City and State: Chicago, Illinois

M. DAVID WEISMAN, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT     )
                                                     )
NORTHERN DISTRICT OF ILLINOIS    )

## <u>AFFIDAVIT</u>

I, Robert P. Aronson, being duly sworn, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately February 2022.

2.      As part of my duties as an FBI Special Agent, I investigate violent crimes, including, among others, kidnaping, bank robbery, and the apprehension of violent fugitives. I have participated in the execution of multiple federal search warrants.

3.      This affidavit is made in support of an application for a warrant to search the gold Toyota Camry bearing Illinois license plate DL 4333 A, located at 2111 West Roosevelt Road in Chicago, Illinois, described further in Attachment A (the "**Subject Vehicle**"), for evidence, instrumentalities, and fruits described further in Attachment B, concerning bank robbery offenses, in violation of Title 18, United States Code, Section 2113.

4.      The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence, instrumentalities, and

fruits of violations of Title 18, United States Code, Section 2113, are located at 2111 West Roosevelt Road in Chicago, Illinois.

## I.     FACTS SUPPORTING PROBABLE CAUSE TO SEARCH

### A.     Summary

5.     On February 8, 2023, at approximately 5:04 p.m., a white male subject, later identified as VICTOR A. BARAKAT, robbed the Fifth Third Bank using a silver handgun.  As detailed below, the FBI along with other law enforcement officers (LEOs) identified BARAKAT based on (a) a cell phone associated with BARAKAT that the suspect left on the teller counter during the bank robbery, (b) the **Subject Vehicle** that the suspect used to travel to and from the robbery, and (c) a witness who formerly employed BARAKAT and positively identified the bank robber from Fifth Third Bank surveillance photographs as BARAKAT.

6.     LEOs located the **Subject Vehicle** at a dealership owned by BARAKAT on February 9, 2023, and subsequently towed it to the FBI evidence lot at 2111 West Roosevelt Road in Chicago.  BARAKAT was placed in custody at approximately 9:05 p.m. on February 13, 2023, after drawing a handgun on a local LEOs who had knocked on BARAKAT's front door at BARAKAT's residence and attempted to take BARAKAT into custody when BARAKAT opened the door and identified himself.

7.     On February 14, 2023, the Honorable M. David Weisman, United States Magistrate Judge for the Northern District of Illinois, signed a complaint charging BARKAT with bank robbery, under case number 23CR89 (N.D.I.L.).  The facts set forth

below, except for additional details in paragraphs 32 and 52 through 54, are all included in the affidavit that accompanied the Complaint.

**B.    Robbery Of the Fifth Third Bank on Algonquin Road**

8.    On or about February 8, 2023, at approximately 5:04 p.m., Victim Teller 2 was working at the Fifth Third Bank on West Algonquin Road in Rolling Meadows, Illinois when a white male subject entered the bank carrying a small black duffle bag and asked if the bank was closed. The subject was the only non-employee in the bank throughout the encounter. Fifth Third Bank surveillance captured the subject entering the bank:



9.    According to Victim Teller 2, the subject then slowly approached Victim Teller 2's counter and stated that he had a gun and stated that the tellers should not make him cock the gun. Victim Teller 2 then heard what sounded like a gun being cocked by the subject, though Victim Teller 2 did not see a gun because the subject's hands were inside his black coat. Fifth Third Bank surveillance shows the subject holding a silver pistol inside the bank:



The subject then placed a small black duffle bag on the counter, as depicted below:



10.    According to Victim Teller 2 and the surveillance video:

      a.    The subject demanded that Victim Teller 2 give the subject all that

             Victim Teller 2 had and not to do anything stupid.  Victim Teller 2

             replied that Victim Teller 2 did not have a teller drawer because

Victim Teller 2 was in training. The subject then turned to Victim Teller 1, who was standing next to Victim Teller 2, and demanded money.

b. Victim Teller 1 stated that Victim Teller 1 did not have the keys to the teller drawer. The subject then stated that Victim Teller 1 had sixty seconds to give the subject all that Victim Teller 1 had in large denominations bills only or else the subject would "blow this place up."

11. According to Victim Teller 1 and the surveillance video:

a. Victim Teller 1 then walked to the desk area behind the teller counter, retrieved keys, walked back the teller counter, unlocked the top teller drawer, removed large denomination bills of currency, and placed the bills in the black duffle bag that the subject had placed on the teller counter.

b. The subject then left the teller station and exited the bank with the duffle bag. As the subject walked toward the exit, both victim tellers pushed their respective emergency alarm buttons.

12. Victim Teller 1 described the subject as a white male approximately 5 feet 7 inches tall in his late 30s, weighing approximately 160 pounds, wearing a dark winter hat, a mask or fabric around his mouth, a black coat with gold buttons, winter gloves, and dark sunglasses. According to Victim Teller 1, the subject kept one hand in

his coat throughout the encounter. Victim Teller 1 was fearful for his/her safety and the safety of others in the bank.

13. Victim Teller 2 described the robber as a white male, approximately 5 feet 5 inches to 5 feet 7 inches tall, approximately 170 pounds, with brown hair, and wearing an old-style baseball cap, sunglasses, a neck scarf used as mask, a black business type jacket, and dark slacks.

14. At the time of the robbery, the deposits of the Fifth Third Bank were insured by the Federal Deposit Insurance Corporation. An audit later showed that the subject received $224 from Teller 1; surveillance video and subsequent evidence collection showed that the subject dropped $64 of that money on the floor before exiting the bank.

**C.    Recovery of the Robber's Cell Phone**

15. According to the surveillance video, the subject placed a black smartphone on the teller counter during the robbery and did not retrieve it before exiting the bank.

16. According to LEOs and the surveillance video, when LEOs responded several minutes later, bank employees pointed to a black cellular smartphone on the teller counter where the subject was standing when the subject demanded money from the bank tellers. LEOs recovered and inventoried the black smartphone. All Fifth Third Bank employees present at the bank confirmed that the cell phone did not belong to them and that it had not been on the teller counter prior to the subject entering the bank.

**D.** **Surveillance Footage Around the Bank Shows the Robber Coming and Going from the Bank in the Subject Vehicle**

17.    As detailed below, in reviewing surveillance video from Fifth Third Bank, a McDonald's restaurant adjoining the bank, and video footage from the Algonquin Road and New Wilke Road intersection red-light camera, LEOs determined that the subject used a gold early-model Toyota Camry (the **Subject Vehicle**) in the commission of the robbery.

*i.    A Gold Toyota Camry Arrives in the Parking Lot Next to the Bank*

18.    LEOs reviewed surveillance video from the McDonald's restaurant located at 1775 West Algonquin Road in Rolling Meadows.  The McDonald's is directly adjacent to the Fifth Third Bank.  The parking area for the McDonald's and the parking area for the Fifth Third Bank are separated by a curb and a thin strip of grass, as depicted in following Google Maps satellite image of the area:



19.     At approximately 4:48 p.m., a red-light camera video of the New Wilke Road and Algonquin Road intersection shows the **Subject Vehicle** traveling eastbound on Algonquin Road through the cross street of New Wilke Road. The **Subject Vehicle** had a yellow Illinois Temporary Registration bearing 211-AA-483. The **Subject Vehicle** also had visible damage to the rear bumper under the rear passenger taillights, as depicted in the following still photograph from the red-light camera footage:



20.     Separately, also at approximately 4:48 p.m., McDonald's surveillance video footage from February 8, 2023, shows that the **Subject Vehicle** entered the north-facing McDonald's entrance from eastbound Algonquin Road.

21.     The **Subject Vehicle** drives south along the west side of McDonald's, turns eastbound through the south parking lot, then turns northbound along the east side of McDonalds. Before leaving camera view, the **Subject Vehicle** stops, backs up southbound and parks in the south parking lot.  The below Google Maps satellite image depicts the approximate movements of the **Subject Vehicle** using red arrows.  The dotted arrow represents the approximate path of the vehicle as it reversed, and the red circle depicts the approximate initially parking location of the gold Camry.



22.     After remaining parked for a short period of time, the **Subject Vehicle** leaves the parking space in the south parking lot and travels a short distance north along the east side of the McDonalds before leaving camera view. McDonald's surveillance footage has a blind spot along the southeast quadrant of the McDonald's parking lot, as depicted by the red-shaped oval, as follows, in a Google Maps satellite image of the property:

ii.     *A Person Matching the Subject's Description Travels from the Area of the **Subject Vehicle** to the McDonalds*

23.     After the **Subject Vehicle** leaves camera view it does not immediately reappear in McDonald's surveillance footage, which captures the east and northeast area of the McDonald's parking lot and property.  Instead, after several minutes, a subject wearing a black coat, black pants, black hat, and carrying a small black duffle bag, matching the appearance of the subject from the Fifth Third Bank surveillance, appears walking north from the area of the McDonald's surveillance blind spot. McDonald's surveillance captures the subject enter the northeast entrance of the McDonalds at approximately 4:58 p.m. on February 8.

24.     McDonald's surveillance footage of the interior of the restaurant shows the subject walk through the McDonald's and into the bathroom, located on the west side of the building.  McDonald's surveillance footage shows the subject exit the bathroom after a few minutes and then exit the McDonald's from the west door. McDonald's surveillance footage shows the subject walk north along the west side of

McDonald's to the northwest corner of the property before turning and walking directly to the north-facing entrance of the Fifth Third Bank.

        *iii.      The Subject Enters the Bank at 5:04 p.m.*

    25.    McDonald's surveillance shows the subject walk to the front entrance of the bank at approximately 5:04 p.m. The following Google Maps satellite image shows the approximate movements, using red arrows, of the subject, on foot, as the subject walks from the McDonald's to the Fifth Third Bank:



*iv.  The Subject Exits the Bank and Returns to the Direction of the Gold Camry*

26.     At approximately 5:07 p.m., McDonald's surveillance shows the subject exit the Fifth Third Bank, and walk east, returning to the McDonald's lot.  The subject continues east along the north side of the McDonald's and then turns southbound, and walks along the east side of the McDonald's parking lot before entering the McDonald's surveillance blind spot on the southeast quadrant of the property. The following Google Maps satellite image shows, via red arrows, the approximate movements of the subject, on foot, walking from the Fifth Third Bank to the southeast quadrant of the McDonald's lot, which is out of camera view:



*v.*    *The **Subject Vehicle** Then Leaves the Parking Lot*

27.    Approximately 10 to 15 seconds after the subject leaves camera view, a gold four door vehicle, which appears to be the **Subject Vehicle** , emerges from the area of the McDonald's surveillance blind spot, traveling north through the east side of the McDonald's parking lot as depicted as follows:



28.    McDonald's surveillance footage captures the **Subject Vehicle** travel northbound along the east side of the McDonald's parking lot, turn left, traveling westbound along the north side of the McDonald's, before ultimately exiting through the north-side exit of the McDonald's.  Surveillance footage captures the **Subject Vehicle** turning left onto Algonquin Road, westbound, from the McDonald's.  As the **Subject Vehicle** makes the turn, it cuts in front of another vehicle, also attempting to make a left turn to travel westbound on Algonquin Road. The gold Camry is last seen

traveling westbound on Algonquin Road toward New Wilke Road at approximately 5:08 p.m.

### E. Identification of the Subject Vehicle

29.     Illinois Secretary of State records show temporary registration 211-AA-483, affixed to the **Subject Vehicle**, is owned by dealership KB MOTORS in New Lenox, Illinois.   The registered owner of the KB MOTORS dealership is listed as VICTOR ALI BARAKAT with a telephone number of 224-245-2669 and an address in Joliet, Illinois.

30.     As shown below, a review of KB MOTORS's Website shows a gold 2005 Toyota Camry listed on the website as a vehicle for sale.



31.     Only seven vehicles were listed on the website for sale and none of the other vehicles listed for sale were Toyotas or gold in color.   The surveillance footage from McDonald's and the intersection camera shows a gold Toyota Camry with exterior paint damage on the upper portion of the rear passenger-side trunk of the vehicle.   The vehicle for sale on the KB MOTORS website shows the same paint damage in the same

location.  The video footage from the red-light camera also shows a large, distinctive dent to the rear passenger-side tail light area of the vehicle.

32.     On February 9, 2023, LEOs went to KB MOTORS in New Lennox and observed the **Subject Vehicle** that was advertised on the dealership website parked in a lot that was open to the public.  LEOs confirmed that the vehicle had the same paint damage on the upper portion of the rear passenger-side trunk of the vehicle and the same large, distinctive dent to the rear passenger-side tail light area of the vehicle. The **Subject Vehicle** was affixed with an Illinois license plate bearing DL 4333 A, which is listed in Illinois Secretary of State records as registered to KB MOTORs, a dealership owned by BARAKAT.

33.     Based on my training and experience, a review of the McDonald's surveillance footage and the red light camera footage from the intersection of Algonquin Road and New Wilke Road, and LEOs observation of the gold Toyota Camry on the KB MOTORS lot, the vehicle on the website is the same vehicle used by the subject in the commission of the Fifth Third Bank robbery.

34.     On February 9, 2023, at approximately 12:15 p.m., after identifying the **Subject Vehicle** on the KB MOTORS lot, LEOs towed the vehicle to the FBI evidence lot at 2111 West Roosevelt Road in Chicago.  The **Subject Vehicle** is currently at that location and has not been entered or accessed.

### F.    Identification of BARAKAT

35.    Illinois Secretary of State records for VICTOR A BARAKAT list BARAKAT as a white male, 5 feet 8 inches, 193 pounds, with black hair and brown eyes, and 47 years old.   BARAKAT's Illinois Driver's License listed an address in Bolingbrook, Illinois.

36.    On or about February 8, 2023, LEOs went to the Bolingbrook address listed on BARAKAT's Illinois Driver's License and spoke with the current owners at that residence.  The current owners advised that they had purchased the home in July 2022 from BARAKAT.  The homeowners stated that BARAKAT had provided his phone number as 224-245-2669, and they believed BARAKAT had moved to a home in Joliet.

37.    On or about February 8, 2023, at approximately 8:47 p.m., LEOs attempted to contact BARAKAT at the phone number 224-245-2669.  Upon dialing the number, the black smartphone recovered from the Fifth Third Bank teller counter began to ring.  The black smartphone displayed the FBI agent's phone number as the caller.

38.    Separately, the black smartphone, while in the possession of the FBI, received multiple calls from the number 630-803-4217 between approximately 5:25 p.m. and 5:45 p.m., within thirty minutes of the bank robbery.  A LexisNexis public records search of the number 630 803 4217 revealed that it is associated with VICTOR BARAKAT.

39.     On or about February 8, 2023, at approximately 10:04 p.m., LEOs called 630-803-4217. A male answered. The LEO posed as a citizen who had found the black smartphone in a grassy area of the McDonald's property on Algonquin Road in Rolling Meadows, Illinois on the afternoon of February 8. The male voice confirmed that the black smartphone was his and agreed to meet at a gas station across from the McDonald's on Algonquin Road that same evening. The male voice stated that his name was "Victor."

40.     On or about February 9, 2023, at approximately 12:00 a.m., on February 9, 2023, LEOs set up surveillance at the corner of Algonquin Road and New Wilke Road. At approximately 12:30 a.m., the 630 number called the LEO who had posed at a civilian who found the black smartphone that robber left on the teller counter at the Fifth Third Bank during the robbery. The LEO who answered the phone heard the same male voice that had identified himself as "Victor" on the earlier call. Victor stated that he was approximately ten minutes from the gas station. The LEO posing as a civilian confirmed that the LEO would wait for Victor to arrive at the gas station. Several minutes later, the 630 number, once more, called the LEO posing as a civilian. The LEO, again, heard the same male voice who had previously identified himself as "Victor." Victor stated that he was now one minute away from the meetup location at the gas station. Within a minute of this phone call, law enforcement observed a maroon sedan enter the gas station.

41.     LEOs activated their emergency lights and attempted to stop the maroon sedan.  The maroon sedan exited the gas station at a high rate of speed and traveled westbound on Algonquin Road.  In the interest of public safety, LEOs did not pursue the vehicle.  During this encounter, no other vehicle had pulled into or exited the gas station.

42.     On February 13, 2023, LEOs went to the Joliet address listed as BARAKAT's residence in Illinois Secretary of State records and observed the residence to be a newly constructed townhome.  LEOs located the property management company of the condominium and spoke with Witness 2 at the property management office.  Witness 2 provided records for BARAKAT's residence that listed BARAKAT as one of the renters and listed the 224 phone number that LEOs knew to be registered to BARAKAT and associated with black smartphone that the bank robber left on the Fifth Third Bank counter.

43.     The records also listed Discovery Auto Sales, a used car dealership in New Lennox, Illinois as an employer for one of the listed renters of the condominium.  Separately, LEOs learned from local law enforcement officers who were familiar with BARAKAT that BARAKAT had previously worked at Discovery Auto Sales in New Lennox, Illinois.

44.     Based on this information, on February 13, 2023, LEOs went to Discovery Auto Sales and spoke with the dealership's owner, Witness 3.  Witness 3 stated he/she has known relatives of BARAKAT for several decades.  Witness 3 stated Witness 3 has

known BARAKAT for approximately four years and that BARAKAT previously worked for Witness 3 at Discovery Auto Sales approximately two years ago for approximately six months, in total. LEOs showed Witness 3 the following still photograph from Fifth Third Bank Surveillance video footage.



45.     Witness 3 reviewed the photograph and positively identified BARAKAT as the subject in the photograph.

**G.     Arrest of BARAKAT**

46.     On February 13, 2023, at approximately 9:05 p.m., local LEOs knocked on BARAKAT's residence and identified themselves as the police as asked to speak with the subject inside the residence. According to the LEOs, who were familiar with the physical characteristics of BARAKAT based on BARAKAT's Illinois driver's license photograph, the subject, BARAKAT then opened the door of the condominium.

47.     According to local LEOs and the local LEOs body-worn camera footage which captured the interaction between BARAKAT and the local LEOs:

a. Local LEOs identified themselves and asked the subject for his name.

b. BARAKAT identified himself to LEOs as "Victor."

c. A local LEO then reached out to shake BARAKAT's hand. BARAKAT shook the LEO's hand. The LEO then told BARAKAT that BARAKAT was under arrest and attempted to place BARAKAT in custody.

d. BARAKAT, who was now on the front step of the condominium, used his left hand to reach down to his left-side pants pocket, and retrieved a silver semi-automatic handgun.

e. BARAKAT raised the gun toward the LEO who was still clasping BARAKAT's right hand in a handshake.

48. According to the local LEO who shook BARAKAT's hand, the local LEO heard the sound of the handgun click as BARAKAT began pointing it at the local LEOs.

49. According to local LEOs and the local LEOs body-worn camera footage which captured the interaction between BARAKAT and the local LEOs, local LEOs were able to retrieve the handgun from BARAKAT's left hand, subdued BARAKAT to the ground, and then placed BARAKAT into custody at approximately 9:05 p.m.

### H.    Post-*Miranda* Statement of BARAKAT

50.    BARAKAT was transported to the Joliet Police Department for further processing.  At approximately 12:09 a.m. on February 14, 2023, in a Joliet Police Department interview room, FBI agents conducted an interview with BARAKAT that was audio and video recorded.  The agents confirmed BARAKAT's identity and then read BARAKAT *Miranda* rights from a preprinted form.  BARAKAT signed a *Miranda* form stating that he understood his rights and agreed to speak with agents without a lawyer present.

51.    During the course of the interview, BARAKAT did not deny committing the February 8, 2023 bank robbery at Fifth Third, but did not admit to committing the robbery, before ultimately ending the interview.

### I.    Background on Cellular Phones

52.    Based upon my training and experience, I know that cellular phones may contain relevant evidence of robbery offenses, including text messages made or received from the cellular phone that are located in the memory of the cellular phone, which messages may provide information regarding the identities of, and the methods and means of operation and communication used by, the participants in the **Subject Offense**.  Moreover, digital photographs located in the memory of a cellular phone may contain images of the tools or participants involved in the robbery offenses. Moreover, digital photographs stored in a cellular phone may contain images of the user of the cellular, the user's associates (including persons involved in or knowledgeable about

the subject offenses), places frequented by the user of the phone leading up to and during the subject offenses, and locations and instrumentalities used in committing the subject offenses.

53.     In addition, based on my training and experience, I know that information stored within a cellular phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner.

54.     Further, based on BARAKAT's use of a second phone number to try and locate the Subject Phone left at the bank (see paragraphs 38-40), I know BARAKAT

used multiple phones close in time to the robbery and therefore believe there may be evidence of the **Subject Offense** in additional cellular phones.

## II.  CONCLUSION

55.  Based on the above information, I respectfully submit that there is probable cause to believe that bank robbery offenses, in violation of Title 18, United States Code, Section 2113, have been committed, and that evidence, instrumentalities, and fruits relating to this criminal conduct, as further described in Attachment B, will be found in the **Subject Vehicle**, as further described in Attachment A.  I therefore respectfully request that this Court issue a search warrant for the gold Toyota Camry bearing Illinois license plate DL 4333 A located at 2111 West Roosevelt Road in Chicago, Illinois (the **Subject Vehicle**), more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B.

FURTHER AFFIANT SAYETH NOT.

Robert P. Aronson
Special Agent
Federal Bureau of Investigation

Sworn to and affirmed by telephone 21st day of February, 2023

Honorable M. DAVID WEISMAN
United States Magistrate Judge

<u>**ATTACHMENT A**</u>

A gold Toyota Camry, bearing Illinois license plate DL 4333 A (the **Subject Vehicle**),

located at 2111 W. Roosevelt Road in, Chicago, IL 60608, Illinois,  depicted below:





# ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED

Evidence, instrumentalities and fruits concerning violation of Title 18, United States Code, Section 2113, as follows:

1. Any and all firearms and ammunition;

2. Any items that appear similar to those worn during the **Subject Offense**;

3. Any and all articles of clothing that, based on their location, appearance, and/or other information learned at the time of the execution of the warrant, are reasonably believed to be connected to the **Subject Offense**;

4. All cellular telephones found in the **Subject Vehicle**;

5. With respect to any cellular telephones: evidence (including the categories of evidence described above) of the **Subject Offense** located in the vehicle, as follows:

   a. location data during the times of or near the **Subject Offense**;

   b. communications and messages related to the **Subject Offense**;

   c. information relating to the identities, locations, and contact information of participants in, and/or victims of, the **Subject Offense**;

   d. call and text records related to the **Subject Offense**;

   e. electronic images, videos, recordings, notes, and memos; and information, including any SIM cards within any cellular telephones, which tends to identify the user(s) of, or person(s) with control over or access to, the cellular telephones and the telephone numbers assigned to the cellular telephones.

6.      Notebooks and paper that based on their location, appearance, and/or other information learned at the time of the execution of the warrant, are reasonably believed to be connected to the **Subject Offense**;

7.      United States Currency that, based on its location, appearance, and/or other information learned at the time of the execution of the warrant, is reasonably believed to be connected to the **Subject Offense**;

8.      Items that appear likely to contain deoxyribonucleic acid ("DNA") on the interior of the vehicle;

9.      Any latent prints on the interior or exterior of the vehicle; and

10.     Items related to ownership or that indicate possession of the **Subject Vehicle**.

# ADDENDUM TO ATTACHMENT B

Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant authorizes the removal of electronic storage media and copying of electronically stored information, that is described in Attachment B and found in Subject Premises, described in Attachment A, so that it may be reviewed in a secure environment for information consistent with the warrant.

The government's review of any seized electronic devices shall be conducted pursuant to the following protocol:

The government must make reasonable efforts to use methods and procedures that will locate those categories of data, files, documents, or other electronically stored information that are identified in the warrant, while minimizing exposure or examination of categories that will not reveal the items to be seized in Attachment B.

The review of any seized electronic devices may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures if those procedures are designed to minimize the review of information not within the list of items to be seized as set forth in Attachment B:

a. examination of categories of data contained in such computer hardware or computer software to determine whether that data falls within the items to be seized as set forth in Attachment B;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B;

c. surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d. opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B; and

e. using forensic tools to locate data falling within the list of items to be seized as set forth in Attachment B.

Law enforcement personnel are not authorized to conduct additional searches for any information beyond the scope of the items to be seized by this warrant as set forth

in Attachment B.  To the extent that evidence of crimes not within the scope of this warrant appears in plain view during the government's review, the government shall submit a new search warrant application seeking authority to expand the scope of the search prior to searching portions of that data or other item that is not within the scope of the warrant.  However, the government may continue its search of that same data or other item if it also contains evidence of crimes within the scope of this warrant.

The government will return any seized electronic devices, within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, such device(s) contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.